# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GREAT HILL EQUITY PARTNERS IV, LP, GREAT HILL INVESTORS LLC, FREMONT HOLDCO, INC., and BLUESNAP, INC. (F/K/A PLIMUS), <br><br> Plaintiffs, <br><br> v. <br><br> SIG GROWTH EQUITY FUND I, LLLP, SIG GROWTH EQUITY MANAGEMENT, LLC, AMIR GOLDMAN, JONATHAN KLAHR, HAGAI TAL, TOMER HERZOG, DANIEL KLEINBERG, IRIT SEGAL ITSHAYEK, DONORS CAPITAL FUND, INC., and KIDS CONNECT CHARITABLE FUND, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) C.A. No. 7906-VCG ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: November 15, 2019
Date Decided: February 27, 2020

Rudolf Koch, Robert L. Burns, and Megan E. O'Connor, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Adam Slutsky, of GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Plaintiffs Great Hill Equity Partners IV, LP, Great Hill Investors LLC, Fremont Holdco, Inc., and BlueSnap, Inc. (f/k/a Plimus).*

William B. Chandler III, Ian R. Liston, and Jessica A. Hartwell, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; OF COUNSEL: Mark A. Kirsch, Scott A. Edelman, Aric H. Wu, Laura K. O'Boyle, and Peter Wade, of GIBSON, DUNN & CRUTCHER LLP, New York, New York, *Attorneys for Defendants SIG Growth Equity Fund I, LLLP, SIG Growth Equity Management,*

*LLC, Amir Goldman, Jonathan Klahr, Donors Capital Fund, Inc., and Kids Connect Charitable Fund*.

Lewis H. Lazarus of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Peter N. Flocos and Joanna A. Diakos, of K&L GATES LLP, New York, New York, *Attorneys for Defendants Tomer Herzog and Daniel Kleinberg*.

David S. Eagle and Sean M. Brennecke, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; OF COUNSEL: Michael K. Coran, William T. Hill, Monica Clarke Platt, and Gregory R. Sellers, of KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania, *Attorneys for Defendants Hagai Tal and Irit Segal Itshayek*.

GLASSCOCK, Vice Chancellor

This matter arises from the purchase and sale of a company, now BlueSnap, Inc., formerly, and referred to in this Memorandum Opinion as, Plimus. This has been a large litigation; generous in the scope of its allegations of fraud and contractual breach; broad in its cast of Defendants; deep in its damages claims; extensive in its discovery and preparation; and lengthy in its trial presentation and briefing. The latter resulted in a liability Memorandum Opinion ("*Great Hill I*") in which I rejected the bulk of the Plaintiffs' claims, but found liability for a few breaches of contractual representations and for two instances fraudulent misrepresentation, the latter on the part of Defendant Hagai Tal. Both breach of contract and fraud number among their elements resulting damages; this Memorandum Opinion deals with that element of the Plaintiffs' case. The Plaintiffs—who bear the burden to demonstrate damages—were content with the presentation they had made at trial, primarily relying on an expert report and testimony made in light of the aforementioned generously-proportioned allegations, rather than the greatly circumscribed liability I found in *Great Hill I*.

Accordingly, I address damages below. The result I reach, as a function of the scope of the litigation, is not large; it is constrained by the record created, and is cabined by the law of damages as I understand it. This Memorandum Opinion also addresses the Plaintiffs' claim against stockholders of Plimus for unjust enrichment, which I find to be unfounded. My rationale follows.

1

# I. GREAT HILL I[1]

This action concerns the acquisition of a California corporation, Plimus, by a private equity firm, Great Hill.[2] Plimus facilitated transactions between small online retailers and consumers by operating as a "reseller."[3] Plimus's business depended on relationships with payment processors, PayPal being a well-known example.[4] Plimus, which had relationships with both the retailers, on one side, and the payment processors, on the other, offered a service that permitted the payment processors to deal with a single reseller rather than contracting with the large number of small retailers.[5] Plimus would constructively "acquire" the product from the retailer and receive payment for that retailer from a payment processor.[6] The payment processors had contractual relationships with the credit card companies and their banks.[7] The arrangement allowed the service or product to be delivered directly to the credit card holder/purchaser from the online merchant.[8]

---

[1] Interested readers can refer to *Great Hill I*, the post-trial memorandum opinion concerning liability: *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829 (Del. Ch. Dec. 3, 2018).

[2] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *1–2 (Del. Ch. Dec. 3, 2018). I refer to Plaintiffs Great Hill Equity Partners IV, LP, and Great Hill Investors LLC collectively as "Great Hill."

[3] *Id.* at *1. Such small online retailers are known as "long tail" vendors. *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

This system works as long as the online retailer delivers a satisfactory product or service—if not, the credit card companies are responsible to their card holders for cancellation of the debt incurred for fraudulent or misrepresented products known as "chargebacks."[9]  Where chargebacks occur, the banks and credit card companies impose contractual "fines" on the payment processors.[10]  As the ultimate source of the fines are the retailers, and the payment processors serve the retailers through facilitators/resellers like Plimus, chargebacks harmed the relationship between Plimus and its payment processors.[11]  "In other words, if the reseller handles transactions from retailers whose business practices engender excessive chargebacks, the contractual relationship between the reseller and the payment processor will be strained or ruptured."[12]  Plimus's business could not survive without such relationships.

Great Hill bought Plimus in 2011 (the "Merger"), valuing Plimus based on due diligence, management projections, and representations and warranties made in the Merger agreement (the "Merger Agreement").[13]  Post-Merger, Plimus underperformed Great Hill's expectations and Great Hill sued the principals and

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

3

stockholders of Plimus, alleging breaches of the contractual representations and warranties, and fraud and fraudulent inducement related to the sale.[14]

In November and December of 2017 I held a ten-day trial with live testimony from thirteen witnesses.[15] The parties submitted over two thousand exhibits and lodged fifty-eight depositions.[16] I released *Great Hill I*, a post-trial Memorandum Opinion on December 3, 2018.[17] The matter was bifurcated, so *Great Hill I* concerned only the *liability* of the Defendants—matters of *damages* were not considered. This Memorandum Opinion considers the damages flowing from the liability proven by the Plaintiffs at trial by a preponderance of the evidence.[18] This section offers a (regrettably) lengthy summary of *Great Hill I*, as necessary to an understanding of my decision here. I then assign damages.

*A. The Parties*

Defendant Hagai Tal was Plimus's CEO at the time of the Merger, a position he held since 2008.[19] Tal was the only Defendant found liable for fraud or fraudulent inducement in *Great Hill I* and I necessarily consider the damages owed by him apart from the other Defendants.[20]

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] Memorandum Opinion, D.I. 644.
[18] *Great Hill*, 2018 WL 6311829, at *1.
[19] *Id.* at *3, *22.
[20] *Id.* at *45.

4

The other liable Defendants, along with Tal, were termed the "Indemnification Defendants" in *Great Hill I*. The Indemnification Defendants were termed as such because indemnification claims were brought against them under the Merger Agreement—the Indemnification Defendants include all pre-Merger stockholders of Plimus.[21] In addition to Tal, the Indemnification Defendants are: Irit Segal Itshayek, Plimus's then-Vice President of Financial Strategy and Payment Solutions,[22] Tomer Herzog and Daniel Kleinberg, Plimus's founders (the "Founders"),[23] SIG Growth Equity Fund I, LLLP ("SIG Fund"), a private equity fund and a large stockholder in Plimus at the time of the Merger,[24] SIG Growth Equity Management, LLC ("SGE"), SIG Fund's manager,[25] and Kids Connect Charitable Fund and Donors Capital Fund, Inc. (together, the "Charity Defendants"), two donees of Plimus preferred shares.[26]

Apart from Tal and the Indemnification Defendants are two additional Defendants: Amir Goldman and Jonathan Klahr. Goldman and Klahr were

---

[21] *Id.* at *46.
[22] *Id.* at *6.
[23] *Id.* at *2.
[24] *Id.*
[25] *Id.*
[26] *Id.* at *27. The Charity Defendants' shares were donated by SGE. *Id.*

5

managing directors at SGE during the relevant time period.[27] Goldman and Klahr were absolved of liability in *Great Hill I*.[28]

The Plaintiffs, Great Hill and its affiliates, purchased Plimus in a transaction that closed on September 29, 2011.[29] Plaintiff BlueSnap, Inc. is the same entity as Plimus, which was renamed after the transaction closed.[30] I refer to the entity here pre and post-closing as Plimus for simplicity's sake.

I discuss each of the Plaintiffs' claims and my findings on liability below, offering that background information sufficient to comprehension of the claims and my subsequent findings and resulting damages. Unfortunately, I find the nature of the damages analysis offered by the Plaintiffs requires that minimum background to nonetheless be rather extensive.

*B. Fraud and Fraudulent Inducement Claims*

The Plaintiffs brought fraud and fraudulent inducement claims against Goldman, Klahr, Tal, and Itshayek (together, the "Fraud Defendants") highlighting "four major interrelated components" of the alleged fraud.[31] I noted that the elements of fraud and fraudulent inducement are:

(1) a false representation, usually one of fact, made by the defendant;
(2) the defendant's knowledge or belief that the representation was

---

[27] *Id.* at *2, *3.
[28] *Id.* at *31–45. Another defined group of Defendants, discussed below, is the "Fraud Defendants," which is: Tal, Itshayek, Goldman, and Klahr. *Id.* at *31.
[29] *Id.* at *6.
[30] *Id.* at *28.
[31] *Id.* at *31.

6

false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[32]

I also noted that "[a] false representation is not only an overt misrepresentation—that is, a lie—but can also be a deliberate concealment of material facts, or silence in the face of a duty to speak."[33] Furthermore, in contrast with breaches of the Merger Agreement (which are discussed in Section I.C. *infra*), "in the case of fraud or misrepresentation" the Merger Agreement does not limit remedies.[34]

### 1. Fraud Claim for the Paymentech Termination

The first fraud claim alleged misrepresentations and omissions against the Fraud Defendants in connection with the termination of the business relationship between Plimus and a payment processor, Paymentech.[35]

In late 2010 and early 2011, both Paymentech and Plimus soured on their business relationship.[36] Tal and Itshayek determined that Plimus needed to end its relationship with Paymentech towards the end of 2010 after Paymentech informed Plimus it would stop processing Plimus's transactions outside the United States,

---

[32] *Id.* at *32 (citing *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018)).

[33] *Id.* (citing *Stephenson*, 462 A.2d at 1074).

[34] *Id.* at *48–50.

[35] *Id.* at *33.

[36] *Id.* at *7.

Canada, and the European Union.[37]   This included areas "in which Plimus did significant business."[38]   Paymentech, on the other hand, had repeatedly informed Plimus that Plimus was failing to comply with various credit card association rules.[39]

Paymentech, *not Plimus*, ultimately decided to unilaterally terminate the business relationship via letters to Plimus on February 4, February 14, March 1, and March 3, 2011 (the "Paymentech Termination Letters").[40]   Great Hill never received the Paymentech Termination Letters.[41]   The Plaintiffs levied two separate fraud allegations in connection with Paymentech's termination of the business relationship: (1) because the Paymentech Termination Letters were responsive to due diligence requests, the failure to disclose them to Great Hill constituted a "deliberate concealment of material facts" sufficient to support a finding of fraud and (2) a legal disclosure describing the termination as "mutual" was a fraudulent misrepresentation.[42]   I discuss each allegation, and my findings, in turn.

> a. The Fraud Defendants Did Not Knowingly Conceal the Paymentech Termination Letters from Great Hill

While I found that Great Hill never received the Paymentech Termination Letters, I also found that Goldman and Klahr did not knowingly conceal the

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.* at *33.
[41] *Id.*
[42] *Id.*

Paymentech Termination Letters because they directed Plimus's legal counsel, Perkins Coie LLP ("Perkins Coie"), to release them into a due diligence data room in early May 2011 and "expressed an understanding that the Paymentech Termination had been resolved and was ordinary course."[43] Thus, Goldman and Klahr "subsequently believed that the letters had been released to the data room" and "had no knowledge of the omission of the letters, nor were they recklessly indifferent to the omission" because they "had no responsibility regarding the data room or responding to diligence requests."[44] I likewise found that Itshayek believed the Paymentech Termination Letters were in the data room.[45] Finally, I found that Tal believed that the Paymentech Termination Letters were in the data room, as corroborated by his assent (to Perkins Coie) to their release to the data room and his offer of physical copies of the letters to PricewaterhouseCoopers LLP ("PwC") in June 2011 when PwC was conducting on-site due diligence of Plimus on Great Hill's behalf.[46] Because "none of the Fraud Defendants intentionally concealed [the Paymentech Termination Letters]," I concluded that no finding of fraud could be based on failure to provide the Paymentech Termination Letters to Great Hill.[47]

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

9

b. The False Representation on the Paymentech Termination
Was Not Material

As part of the sale process Perkins Coie drafted a disclosure schedule, which

included a disclosure of Paymentech's termination of Plimus.[48]  The disclosure

schedule was eventually presented to Great Hill, and read, in pertinent part:

> [Plimus] and Paymentech . . . entered into an exclusive . . . Agreement
> . . . . [which] was scheduled to be renewed in September 2011.
> However, in early 2011, [Plimus] decided that it did not want to
> continue working with [Paymentech] under the then negotiated terms .
> . . . [Plimus] then attempted to negotiate modified terms . . . . However,
> [Paymentech] refused . . . . In February and March 2011, [Paymentech]
> encountered issues related to the Royal Bank of India . . . .
> [Paymentech] asked Plimus to make specific changes to the Company's
> platform . . . . Since [Plimus] did not feel this would in its best interests,
> [Plimus] and [Paymentech] instead mutually agreed to terminate the
> agreement . . . . As of May 13, 2011, [Paymentech] continues to hold a
> reserve of approximately $500,000 to cover future potential refunds and
> chargebacks . . . .[49]

I found that this disclosure was false and that Tal, Goldman, and Klahr knew it was

false because all three knew it was Paymentech who had ended the relationship while

the disclosure described the ending as "mutual."[50]  I also found that Tal, Goldman,

and Klahr intended Great Hill to rely on the false disclosure in order to facilitate the

---

[48] *Id.* at *11.

[49] *Id.*  This disclosure was eventually removed and did not appear in the disclosure schedule that accompanied the Initial Merger Agreement.  *Id.*

[50] *Id.* at *34.  As to Itshayek, I found that "[w]hile Itshayek also knew Paymentech had taken the first step in terminating the relationship, the Plaintiffs do not allege that she helped draft, review or even that she saw the disclosure that Tal prepared.  As a result, Itshayek did not have the requisite knowledge that the disclosure was false to support a fraud claim against her."  *Id.*

10

sale process, Merger Agreement, and closing of the Merger.[51]  However, I found that Great Hill did not justifiably rely on the disclosure because Great Hill had an "accurate understanding [as to the Paymentech termination] as of the time of the transaction," and thus the misrepresentation and not material.[52]  Therefore, I found that the Fraud Defendants' misrepresentation regarding Paymentech could *not* support liability for fraud.[53]

### 2. Fraud Claim for Plimus's History of Violations and Risk Monitoring Systems

The Plaintiffs next fraud claim concerned the quality of Plimus's business and alleged that the Fraud Defendants hid a long history of violations and fabricated Plimus's risk-monitoring prowess.[54]

### a. The Fraud Defendants Did Not Make Any False Representations on Plimus's Risk Monitoring Systems

The Plaintiffs claimed that the Fraud Defendants falsely represented that Plimus had "robust" and "proactive" risk monitoring systems because certain "mass vendor terminations" in 2010 and 2011 were initiated by Plimus's payment processors and not from Plimus's own internal risk monitoring.[55]  The Fraud Defendants denied making those representations and retorted that they represented

---

[51] *Id.* at *35.
[52] *Id.* at *36.
[53] *Id.*
[54] *Id.*
[55] *Id.* at *37.

11

only that "Plimus monitors the performance of sellers and cleanse[s] sellers with negative perception, consistent issues with buyers or high chargeback issues"—insisting this representation was accurate.[56] Plimus's written policy on risk review—disclosed to Great Hill—stated that Plimus reviewed vendors for violations of Plimus's terms of use and for copyright infringement, and that Plimus will react to alerts from processors "based on the [processor's] requirements."[57] The Plaintiffs' fraud allegations regarding risk monitoring centered on two instances of vendor terminations, one in 2010 and one in 2011.

### i. 2010 Vendor Terminations

Plimus responded to a due diligence request from Great Hill requesting more information about $250,000 in fines that Plimus paid for an excessive chargeback monitoring program in 2010 due to an increase in chargebacks related to Plimus's

---

[56] *Id*. (internal quotation marks omitted). "The credit card associations had excessive chargeback monitoring programs for merchants designed to incentivize these merchants to reduce their chargebacks. Generally, merchants entered the programs when their chargeback ratio exceeded a certain threshold for a number of consecutive months. After that point, the merchant would be charged a fine per chargeback (on top of already paying the amount of the chargeback and a fee), and the amount of the fine per chargeback would increase the longer the merchant remained in the program. Once the chargeback ratio fell below the threshold, the merchant would generally be removed from the excessive chargeback program. The key metric was the chargeback ratio, which was generally calculated by dividing the number of chargebacks in a month by the total number of transactions in the same month. Visa and MasterCard calculated the chargeback ratio slightly differently; MasterCard used the previous month's transaction volume to calculate the chargeback ratio. Visa and MasterCard would place merchants in excessive chargeback monitoring programs if the merchant's chargeback ratio for United States transactions exceeded one percent for two consecutive months." *Id*. at *13 (internal citations and quotation marks omitted).
[57] *Id.* at *37.

"poker chip vendors."[58]  After Great Hill followed up on these responses, Plimus indicated that eight hundred vendors, consisting of "[p]arty poker chip vendors, underperforming utility software vendors, and certain online services with high rate [sic] of dissatisfaction" were terminated in the first quarter of 2010.[59]  The vendors had been terminated for issues with excessive customer disputes, chargeback activity, and business models that were not attractive to Plimus's payment processors.[60]

Regarding these vendors, Plimus had received notices from Paymentech that Plimus *as a whole* was exceeding its chargeback ratio ceiling—no individualized notices specific to each Plimus vendor exceeding the ceiling were sent to Plimus.[61] Plimus then identified and terminated certain vendors with high chargebacks to reduce the Plimus-wide chargeback ratio although in the record there was no indication that prior to their termination these vendors violated Plimus's terms of use.[62]  The Plaintiffs claimed that Plimus's diligence disclosure that "[Plimus] became aware of these issues upon reviewing each vendors' chargeback history" was a false representation because it "conveyed the impression that Plimus's own internal procedures led to this review, which in fact arose based on communication

---

[58] *Id.* at *15.
[59] *Id.* at *16.
[60] *Id.*
[61] *Id.* at *37.
[62] *Id.*

from the processor."[63]  However, because nothing about the disclosure to Great Hill "suggest[ed] that the review was independent of communications with Paymentech, and the disclosure is not otherwise inconsistent with Plimus's disclosed written policies," I found that the Fraud Defendants did not make false written representations in the disclosure regarding the vendor terminations.[64]

ii. 2011 Vendor Terminations

In March and April 2011, Plimus added new vendors, several of whom were known as "biz opp" vendors involved in "get rich quick" schemes—by May 2011 the "biz opp" vendors were producing high chargebacks.[65]  PayPal, which was processing most of Plimus's United States transactions at this time, raised concern about these vendors and told Plimus it should terminate one vendor in particular, GoClickCash.[66]  Plimus immediately terminated GoClickCash, and after an internal review terminated sixteen additional vendors.[67]

The Plaintiffs alleged that Itshayek falsely told Great Hill that the termination of the sixteen vendors was the result of Plimus's risk monitoring systems.[68]  However, I found that this statement was not false because Itshayek "testified

---

[63] *Id.*

[64] *Id.*  Because the Plaintiffs' allegations of fraud against Goldman and Klahr in connection with risk monitoring stemmed only from written communications, I found that the Plaintiffs had failed to show fraud against Goldman and Klahr for risk monitoring representations.  *Id.*

[65] *Id.* at *15.

[66] *Id.*

[67] *Id.*

[68] *Id.* at *37.

credibly" that she told Great Hill that the 2011 termination started with a PayPal notice on GoClickCash and that Plimus then identified sixteen similar vendors and terminated them as well.[69] I noted that while Plimus "may have felt that the sixteen similar vendors would cause problems with PayPal in light of PayPal's initial notice, it was still Plimus who identified the sixteen problematic vendors, and Plimus who decided to terminate the additional vendors based on the assessment of the risk imposed on Plimus."[70] Itshayek's description of the termination was consistent with Great Hill's account and matched Plimus's written policy, thus, there was no false representation regarding the termination of the "biz opp" vendors.[71]

>### iii. Alleged Descriptions of Plimus's Risk Monitoring as "Robust" or "Proactive"

Finally, I found that even if the Plaintiffs could show that Tal and Itshayek mischaracterized Plimus's risk monitoring systems and policies as "robust" or "proactive," as Great Hill alleged, Great Hill did not prove fraud because it could not justifiably rely on these alleged misrepresentations.[72] The reasons for this were threefold. First, PwC's due diligence report stated that Plimus should be more "proactive" in dealing with chargebacks and detailed how vendors were enrolled as Plimus clients.[73] Such enrollment was "self-service" and PwC noted that Plimus

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* at *38.
[73] *Id.*

"delay[ed] the majority of the seller underwriting until the point at which the seller is most likely to begin processing."[74]  Second, Great Hill's own due diligence, confirmed through the testimony of a Great Hill employee, disclosed the limited extent to which Plimus could be said to have "robust" or "proactive" risk monitoring systems because vendors could onboard themselves and avoid scrutiny for months.[75] Finally, Great Hill was aware that Plimus "engaged in sporadic large-scale purges of vendors" as opposed to "continuous small scale terminations" that would have been "consistent with proactive risk monitoring."[76]  Therefore, based on Great Hill's own diligence findings, the Plaintiffs could not have justifiably relied upon alleged representations that Plimus's risk monitoring was "robust" or "proactive."

> b. The Plaintiffs Did Not Show Justifiable Reliance on False Representations Made About Plimus's History of Violations

In terms of a history of violations, Paymentech fined Plimus on many occasions—almost all of the fines related to excessive chargebacks.[77]  Furthermore, Plimus exceeded permitted chargeback ratios for PayPal Pro (discussed in detail in Section I.B.4. *infra*) and was apprised before closing that PayPal would levy a fine related to GoClickCash.[78]  When Plimus exceeded chargeback ratios, entered into

---

[74] *Id.*  The implications of this were that "Plimus's onboarding process allowed vendors—including illegitimate vendors—to potentially transact business through Plimus for months before discovery."  *Id*. at *41.

[75] *Id.* at *38.

[76] *Id*.

[77] *Id.* at *36.

[78] *Id*.

excessive chargeback programs, or otherwise violated card network rules and regulations the applicable payment processor (such as Paymentech or PayPal) would email Plimus.[79] The emails "at least contained a description of the problem, and sometimes included language copied and pasted from a notice the processor received from the card networks."[80] The Plaintiffs noted that the emails were responsive to diligence requests—the Plaintiffs received a response that no such communications existed and these emails were not provided to Great Hill.[81] Furthermore, Plimus reported to Great Hill only $250,000 in fines for 2010, however, they did not report fines Plimus paid in 2010 for MasterCard excessive chargebacks.[82] The Plaintiffs alleged that these actions were fraudulent.[83]

I termed the fines and communications on violations as "Plimus's history of violations" and found that the lack of disclosure regarding Plimus's history of violations constituted false representations.[84] I found that Tal and Itshayek—but not Goldman and Klahr—had knowledge of such false representations and intended that Great Hill rely on them and consummate the transaction.[85] However, I found that

---

[79] *Id.*

[80] *Id.* In some cases, the emails included the whole notice. *Id.*

[81] *Id.* at *36, *38. The responses from Plimus were in Plimus's June 18, 2011 and June 25, 2011 responses to a Great Hill diligence request. *Id.* at *38.

[82] *Id.* at *38.

[83] *Id.* at *36.

[84] *Id.* at *38.

[85] *Id.* at *38–39. I did note that Tal and Itshayek shared information such as Plimus's processor statements and certain PayPal chargeback issues with Great Hill, "run[ning] counter to the Plaintiffs' theory that Tal and Itshayek were trying to create an illusion of a company in good

17

Great Hill did *not* justifiably rely on Tal and Itshayek's false representations and omissions about Plimus's history of violations and could not "have reasonably believed that Plimus was always a company in good standing with the card associations, based on Tal and Itshayek's false representations and omissions."[86] Furthermore, PwC's diligence report and Great Hill's own due diligence memo to its partners showed that Great Hill was aware that Plimus exceeded chargeback ratios throughout 2010 and in June 2011.[87] Thus, communications to this effect "would simply have confirmed Great Hill's understanding."[88] Finally, I turned to the non-disclosure of certain PayPal communications from 2011 and found that based on Great Hill's actual knowledge of Plimus's extensive history with chargebacks and a bargained-for indemnity for fines related to pre-closing chargeback issues, there was "no justifiable reliance on false representations about Plimus's history of violations and compliance with card network rules."[89]

---

standing." *Id.* at *39. I found, however, that "despite Tal and Itshayek's willingness to discuss chargebacks with Great Hill, they withheld the actual notices that underlined those chargeback issues, even when PwC sent a specific diligence request for such notices after its on-site visit. Furthermore, the representation that Plimus had no such notices was reiterated with each update to Plimus's response to Great Hill's due diligence request—responses that were reviewed or drafted, in pertinent part, by Tal and Itshayek. This belies innocent mistake." *Id.*

[86] *Id.* at *39.

[87] *Id.*

[88] *Id.* I also found that Great Hill did not demonstrate justifiable reliance on the "exact amount of fines paid in 2010, the affirmatively false representation that documents explaining the fines and violations did not exist, nor on Tal's and Itshayek's silence when the due diligence responses were updated [on June 25, 2011] without correcting the original false representations" because "[a]ny information provided to Great Hill in that regard would have been cumulative." *Id.*

[89] *Id.* at *40. I discuss Plimus's relationship with PayPal extensively in Section I.B.4. *infra.*

18

### c. Miscellaneous Fraud Allegations

After finding that the Plaintiffs did not prove fraud in relation to Plimus's history of violations or risk monitoring systems I discussed several miscellaneous fraud allegations that did not fit into either of the four general categories of alleged fraud. These "violations of practices" were allegedly not disclosed and "reflected poor business quality or poor processor relationships."[90] I declined to find liability on each and discuss each in turn.

The Plaintiffs alleged that Plimus engaged in mass refunds and volume shifting to avoid excessive chargebacks and that this practice should have been disclosed.[91] Plimus would sometimes issue mass refunds to their vendor's customers so that they would not ask for chargebacks; this practice was an effort to decrease the chargeback ratio.[92] Volume shifting or "load balancing" was a practice whereby Plimus would manually reroute transactions through certain payment processors in an attempt to reduce the chargeback ratio—increasing the number of transactions increased the denominator in the chargeback ratio, reducing the chargeback ratio.[93] The evidence did not show that either practice violated card association rules at the time.[94] Therefore Plimus was not required to disclose the practices as rule violations,

---

[90] *Id.*
[91] *Id.*
[92] *Id.* at *13.
[93] *Id.* at *23.
[94] *Id.* at *40.

and the Plaintiffs did not point to any affirmative misrepresentations in regard to mass refunds or volume shifting.[95]

The Plaintiffs complained about disclosures on IP infringement. I found that Plimus was often sent inquiries about IP infringement, and Great Hill was aware Plimus received such notifications on an ordinary basis and that they were common in the industry.[96] I found that the Plaintiffs failed to demonstrate any misrepresentation with respect to IP infringement.[97]

The Plaintiffs also contended that the Fraud Defendants made representations about the growth of Plimus, the visibility of financial performance, and the quality of vendors.[98] To the extent the statements were projections or expectations, I found there was no reliance and that the Plaintiffs had not made any claims that the projections were not made in good faith.[99] Additionally, the Plaintiffs appeared to contend that Plimus concealed or misrepresented the fact that many of its vendors' businesses were of questionable validity.[100] I found, however, that Great Hill knew before the transaction that "the vast majority of Plimus's vendors were 'long tail' vendors, and that there was frequent churn of these vendors."[101] Great Hill was well

---

[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.* at *41.
[99] *Id.*
[100] *Id.*
[101] *Id.*

aware of Plimus's business model which included the quality of the vendors, and thus could not establish justifiable reliance on any misrepresentations that may have been made regarding vendor quality.[102]

### 3. Fraud Claim for Dispute over Tal's Earn Out Agreement with the Founders

I discussed a separate fraud allegation relating to an earn-out agreement Tal had with the Founders.[103] The substance of the Plaintiffs' allegation was that a dispute existed between Tal and the Founders and the substance of the dispute was not disclosed and that any partial disclosure of the dispute was materially misleading.[104] The details of this allegation are not pertinent to determining the damages owed pursuant to the liability found in the *Great Hill I*, and it suffices to say that I did not find any liability for the fraud claims in connection with the dispute over the earn-out agreement.[105]

### 4. Fraud Claim for PayPal's Notice of Violations and Threats to Terminate

The final fraud allegations involved Plimus's relationship with PayPal.[106] The allegations of fraud in connection with PayPal involved the failure to disclose and/or

---

[102] *Id.* Along with the three miscellaneous fraud allegations discussed above, I noted allegations surrounding a PayPal Business Risk Assessment and Mitigation ("BRAM") violation in connection with GoClickCash. I discussed that allegation in greater depth in connection with the other PayPal fraud allegations, which are summarized *infra* Section I.B.4.
[103] *Id.*
[104] *Id.*
[105] *Id.* at *41–42.
[106] *Id.* at *43.

21

the active concealment of: PayPal's notice of violations and fines; Plimus's efforts to address chargebacks and other violations with PayPal; Plimus's practice of reactive vendor termination; and PayPal's threats to terminate its relationship with Plimus.[107]

I noted that I had already found that the Plaintiffs had not shown fraud as to notices of chargebacks, the practices of load balancing and mass refunds, and representations about business quality and risk management systems.[108] I additionally found that there was no misrepresentation as to PayPal's determination that Plimus would be assessed a Business Risk Assessment and Mitigation ("BRAM") violation in connection with GoClickCash.[109] A BRAM violation is considered a severe violation.[110] PayPal notified Plimus of the BRAM violation in connection with GoClickCash on October 6, 2011.[111] The Merger closed on September 29, 2011.[112] Thus, the allegation of a BRAM violation was not disclosed to Great Hill pre-closing; it could not have been, because Tal and Itshayek (and the other Fraud Defendants) were unaware, pre-closing, that PayPal considered the GoClickCash violation to be a BRAM violation.[113] Therefore, there could be no

---

[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at *28.
[111] *Id.*
[112] *Id.* at *27.
[113] *Id.* at *43.

22

fraud liability for failing to disclose that Plimus would be assessed a BRAM violation in connection with GoClickCash.[114]

After finding no fraud liability based on the above allegations in connection with PayPal, I moved onto the remaining allegations of fraud: the failure to disclose that PayPal was fining Plimus related to GoClickCash and the failure to disclose that PayPal was threatening to terminate its relationship with Plimus.[115]

Plimus had three separate PayPal accounts: PayPal Wallet,[116] PayPal Israel,[117] and PayPal Pro.[118] At the end of the Paymentech relationship, PayPal Pro became Plimus's top processor by volume and its only United States-based processor.[119] On August 4, 2011 PayPal informed Plimus that Plimus had exceeded a one percent chargeback for MasterCard for July 2011, the second consecutive month, and a week later informed Plimus that if the chargeback ratio for MasterCard exceeded one percent for a third month, PayPal might issue a 30-day termination notice and end its relationship with Plimus.[120] A Plimus employee wrote to Tal: "PayPal will issue

---

[114] *Id.*
[115] *Id.*
[116] PayPal Wallet was an alternative payment method, under which consumers entrusted PayPal with their financial information and PayPal then provided payment directly, so that the merchant never saw the consumer's financial information. *Id.* at *22. PayPal Wallet stored consumer's financial information, making transactions more convenient, and Plimus's own PayPal Wallet account allowed it to accept payments from consumers' PayPal Wallet accounts. *Id.*
[117] Plimus's PayPal Israel account was a PayPal Wallet account, but for international, primarily Israeli, transactions and was maintained separately from the PayPal Wallet account. *Id.*
[118] Plimus's PayPal Pro account was simply a payment processing account, largely indistinguishable from the service provided by Plimus's other payment processors. *Id.*
[119] *Id.*
[120] *Id.*

23

a 30 day notice to potentially shut down Plimus'[s] ability to process on the [PayPal] Pro account unless numbers improve."[121]  On August 15, 2011 the same employee detailed to PayPal Plimus's efforts to reduce chargebacks including by mass refunds and load balancing.[122]  PayPal continued to threaten termination and in mid-August 2011 explained to Plimus that the chargeback ratio for August would be determinative.[123]  PayPal's internal emails reflected calls with Plimus on August 19, August 26, and September 1 threatening termination.[124]  However, based on experience with other payment processors, neither Tal nor Itshayek believed a third month of excessive chargebacks would actually result in a thirty-day termination letter.[125]

Plimus's MasterCard chargeback ratio for PayPal Pro once again exceeded one percent for August 2011.[126]  However, Plimus did not receive a thirty-day termination notice in September and PayPal did not notify Plimus of any further plans or threats to terminate any of Plimus's PayPal accounts for the rest of the month.[127]  Plimus and PayPal communicated through the month, for instance in late

---

[121] *Id.*
[122] *Id.* at *23.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*  "Itshayek e-mailed PayPal on September 9, 2011 to memorialize a call PayPal had with Tal.  In the e-mail, Itshayek summarized the events and chargeback ratios of the past few months, and ended by telling PayPal, 'we would highly appreciate receiving one additional month to prove the actions taken by Plimus to reduce and control [the chargeback] ratio and general risk.'"  *Id.*

September 2011 PayPal reviewed a list of Plimus vendors and recommended that certain vendor categories be "shut down if [Plimus] want[ed] *to keep* [their] relationship with [PayPal]."[128] I found that at the Merger close Tal and Itshayek did not believe PayPal would terminate Plimus's PayPal Pro account, and believed Plimus's chargeback ratio for MasterCard would not exceed one percent for September.[129] As of September 29, 2011 (the date of closing) an internal PayPal email reflected than an official decision on whether to terminate PayPal had not yet been reached.[130]

After a July 27, 2011 email from Itshayek where she wrote that Plimus did not expect the July PayPal Pro chargeback ratios for Visa or MasterCard for July to exceed one percent, Great Hill received no specific update on the Visa or MasterCard chargeback ratios before the Merger closed.[131] Great Hill did not ask for updates on these specific ratios, but did track Plimus's aggregate chargeback ratio, calculating it from Plimus's materials that Great Hill had been provided with.[132] However, Great Hill was aware that Plimus's aggregate chargeback ratio in July continued to exceed one percent, and in August and September 2011 Great Hill paid close attention to

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.* at *24. I discussed Visa chargebacks in more depth in *Great Hill I*, but the MasterCard chargeback ratio played a larger role in the PayPal saga because the chargeback ratio for Visa through PayPal Pro did not exceed one percent in July or August 2011. *Id.* at *22–23.

[132] *Id.* at *24. Great Hill did not have the detail necessary to calculate the chargeback ratios by processor and region, which were the relevant chargeback ratios for PayPal Pro purposes. *Id.*

the transactions of new vendors.[133]  Tal and a Great Hill employee met in Israel in September 2011, and I found it was most likely that Tal disclosed that Plimus and PayPal were having some dispute, but *did not disclose* the extent of the issue or that it involved explicit threats of termination.[134]

An initial merger agreement was dated August 3, 2011 (the "Initial Merger Agreement"), but the Merger did not close until September 29, 2011.[135]  In the interim, Klahr and SGE's in-house counsel organized a "bring down call" with Plimus management to determine if there had been any changes in the business that would require the disclosure schedule, which had accompanied the Initial Merger Agreement, to be amended.[136]  While Tal did not participate in the call, Tal and Itshayek identified three business issues responsive to the list of questions: (1) the potential fine related to GoClickCash, (2) PayPal's termination threats, and (3) a recent request from PayPal for information on vendor Home Wealth Solutions, whose Visa chargeback ratio was 1.65%.[137]  Tal and Itshayek determined that Itshayek (who participated in the call) should only bring up the request for information on Home Wealth Solutions (which is what occurred)—they reasoned that they should *not* bring up the GoClickCash fine or the termination threats because

---

[133] *Id.*
[134] *Id.*
[135] *Id.* at *22.
[136] *Id.* at *25.
[137] *Id.* at *23, *25.

26

Plimus had not yet received formal notice from PayPal for either and Tal told Itshayek he would bring up both issues personally with Great Hill *prior* to closing.[138]

On September 22, 2011 PayPal informed Itshayek that a $200,000 fine would be imposed for GoClickCash and Itshayek shared this information with Tal.[139] Tal and Itshayek did not raise the PayPal Pro excessive chargebacks, the GoClickCash fine, or PayPal's threats of termination to the Plimus Board of Directors—thus, Goldman, Klahr, Herzog, and Kleinberg were unaware that Plimus had threatened termination of Plimus's PayPal account or of the GoClickCash fine or that Plimus recently exceeded a one percent chargeback ratio for several months.[140] Additionally, the supplemental disclosure to the Merger Agreement included a disclosure on Home Wealth Solutions but no disclosure of the GoClickCash fine or the threatened PayPal termination.[141]

The Merger closed on September 29, 2011.[142] On October 6, 2011, PayPal told Plimus that the fine related to GoClickCash was a BRAM violation.[143] While Plimus's PayPal Pro chargeback ratio in September 2011 did not exceed one percent, on October 7, 2011 PayPal sent Plimus a notice of termination, ending its

---

[138] *Id*. at *25.
[139] *Id*.
[140] *Id*.
[141] *Id*.
[142] *Id*. at *27.
[143] *Id*. at *28.

27

relationship with Plimus.[144]  PayPal terminated all of Plimus's PayPal accounts—PayPal Pro, PayPal Wallet, and PayPal Israel—between November and December 2011.[145]

I found that the non-disclosure of PayPal's termination threats and the GoClickCash fine constituted false representations because they ran counter to representations of the Fraud Defendants that Plimus was in compliance with card network rules and that no suppliers had threatened termination.[146]  However, of the Fraud Defendants I found that *only* Tal knew of the false representations.[147] Goldman and Klahr were not informed of the issues and were not recklessly indifferent as evidenced by the scheduled "bring down" call.[148]  Moreover, while Itshayek knew of the issues, given Tal's assurance he would bring up the GoClickCash fine and the termination threats to Great Hill personally, Itshayek had no reason to believe that the facts would be withheld from Great Hill.[149] Tal intended Great Hill to rely on the false representations in order to induce Great Hill to proceed with the Merger because he recognized that Plimus's problems with PayPal could have a negative effect on the Merger.[150]

---

[144] *Id.*
[145] *Id.* at *29.
[146] *Id.* at *43.
[147] *Id.* at *44.
[148] *Id.*
[149] *Id.*
[150] *Id.*

Finally, I found that Great Hill justifiably relied on Tal's false representations.[151] In contrast to Paymentech, where I found that certain immaterial details were not disclosed, I found that the possibility of losing a second major processor in a matter of few months to be material to a prospective buyer.[152] In contrast to the situation with Paymentech, Plimus was not ambivalent to the PayPal relationship and the loss of PayPal would mean a major disruption to Plimus's business.[153] The reliance was reasonable because Great Hill had completed due diligence before any PayPal termination threats and in the period between the Initial Merger Agreement and closing Great Hill could rely on Tal to raise issues that required attention and Plimus was contractually bound to disclose this information.[154]

My findings were sufficient to find liability against Tal for fraud/fraudulent inducement.[155] In other words, with respect to the multiple allegations of fraud made by the Plaintiffs against multiple Defendants, I found for the Defendants; the only

---

[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.* at *45. Furthermore, I found the other Fraud Defendants not liable for aiding and abetting because they did not show reckless indifference to the PayPal termination threats, and found no civil conspiracy because I did not find aiding and abetting. *Id.* It is worth noting, perhaps, that Tal testified—I believe truthfully—that he did not believe that PayPal would act on its threats to terminate. *See Id.* at *23. Nonetheless, Tal was aware of the threats and fraudulently concealed them from Great Hill.

29

exception being the allegations against Tal with respect to PayPal (including the threat of PayPal to terminate and the GoClickCash fine).

*C. Indemnification Claims*

In addition to their fraud claims, the Plaintiffs alleged that four representations and warranties in the Merger Agreement (a contract) were breached. The claims were brought against the Indemnification Defendants, who were required to indemnify the purchasers for certain breaches of the Merger Agreement.[156] Indemnification claims were not brought against Goldman and Klahr because they were not stockholders of Plimus.[157]

The selling stockholders of Plimus, here the Indemnification Defendants, are known in the Merger Agreement as Effective Time Holders ("ETHs").[158] Section 10.03 of the Merger Agreement provided a limitation on indemnification liability of ETHs for breaches of representations and warranties in the Merger Agreement up to the "Escrow Amount."[159] The Escrow Amount—$9.2 million—was funded by withholding a pro rata share of each ETH's Merger consideration, and was to be held for the "Escrow Period" (twelve months after closing) or until any prior claims were finally adjudicated.[160] Breaches of representations and warranties were to be paid

---

[156] *Id*. at *46, *48.
[157] *Id*. at *46.
[158] *Id*.
[159] *Id*. at *27.
[160] *Id*.

30

from the escrow fund regardless of any fault on the part of an individual ETH and regardless of pre-contractual notice of the falsity of the representations on the part of Great Hill.[161] In the case of a breach, the Plaintiffs can seek indemnification but their right to recover is *limited to* indemnification under the Merger Agreement from the Escrow Amount.[162] In other words, restitution for breaches of representations and warranties is capped at $9.2 million.[163]

The Plaintiffs alleged breaches of the Merger Agreement representations and warranties on: (1) material liabilities or obligations, (2) compliance with contracts, (3) compliance with card system rules, and (4) relationships with suppliers. I found there was no breach of the representation on material liabilities and obligations,[164] and found that a breach of the representations concerning compliance with contracts[165] was duplicative of the representations concerning supplier relationships and compliance with card system rules, both of which I found were breached.[166]

> 1. Representation on Compliance with Card System Rules

The Plaintiffs alleged a breach of Section 3.23 of the Merger Agreement, which contains the following representation:

> The Company . . . is and has been in compliance with the bylaws and operating rules of any Card System(s), the Payment Card Industry

---

[161] *Id*. at *49.
[162] *Id*. at *50.
[163] *Id*. at *51.
[164] In Section 3.09 of the Merger Agreement.
[165] In Section 3.16 of the Merger Agreement.
[166] *Great Hill*, 2018 WL 6311829, at *46–47.

Standard (including the Payment Card Industry Data Security Standard), the operating rules of the National Automated Clearing House Association, the applicable regulations of the credit card industry and its member banks regarding the collection, storage, processing, and disposal of credit card data, and any other industry or association rules applicable to the Company . . . in connection with their respective operations.[167]

Specifically the Plaintiffs pointed to the numerous violation notices that Plimus received from Paymentech and PayPal as a breach of the representation that Plimus "is and has been in compliance with the bylaws and operating rules of any Card System(s)."[168]

The Indemnification Defendants conceded a breach of this representation with respect to three fines from PayPal for pre-closing transactions: excessive chargebacks in July, excessive chargebacks in August, and the fine related to GoClickCash.[169] The Plaintiffs did not show any additional fines or violations with regard to PayPal.[170] The Plaintiffs also identified Plimus's failure to disclose violations with connection with Paymentech—I found that the Indemnification Defendants breached the representation with respect to Paymentech given, among other things, its excessive chargeback issues in 2011.[171]

---

[167] JX 796, at 47–48.
[168] JX 796, at 47.
[169] *Great Hill*, 2018 WL 6311829, at *47.
[170] *Id.*
[171] *Id.*

## 2. Representation on Relationships with Suppliers

The Plaintiffs alleged that the Indemnification Defendants breached the representation in Section 3.26(b) of the Merger Agreement, which reads:

> There are no suppliers of products or services . . . that are material to [the Company's] business with respect to which alternative sources of supply are not general available on comparable terms and conditions in the marketplace. No supplier of products or services to the Company . . . had notified the Company . . . *that it intends to terminate its business relationship with the Company* . . . .[172]

The Plaintiffs pointed to the non-disclosure of the threatened PayPal termination as a notification of an intent to terminate a business relationship.[173] Although a termination decision was not made prior to closing, I found that the language did not require a notice of termination, only notification of an *intent* to terminate.[174] Because PayPal representatives expressed such an intent to terminate in emails and calls to Plimus in August and September 2011, I found the Section 3.26(b) of the Merger Agreement was breached.[175]

### D. Summary of Liability

In summary, out of four categories of fraud claims against the Fraud Defendants (Tal, Itshayek, Goldman, and Klahr), *Great Hill I* found that only Tal had liability for fraud/fraudulent inducement and only for PayPal's threats to

---

[172] JX 796, at 68 (emphasis added).
[173] *Great Hill*, 2018 WL 6311829, at *47.
[174] *Id.*
[175] *Id.*

33

terminate and the non-disclosure of the GoClickCash fine. I did not find fraud liability in connection with the Paymentech termination, Plimus's history of violations and risk monitoring systems, or Tal's earn out agreement with the Founders. Furthermore, out of four alleged breaches of the Merger Agreement, I found that the Indemnification Defendants had indemnification liability for two representations: compliance with card system rules[176] and relationships with suppliers.[177] Tal's fraud liability is uncapped while the breaches of the Merger Agreement entitled to the Plaintiffs to restitution from the Indemnification Defendants in an amount capped by the funds in escrow ($9.2 million).

*E. Plimus's Post-Merger Actions*

Because the Plaintiffs' calculation of damages is based in part on Plimus's actions post-Merger, before moving on to the proffered damages it is helpful to recount happenings at Plimus post-Merger.

After PayPal terminated its business relationship with Plimus, it placed Plimus on the MasterCard Alert to Control High-Risk Merchant ("MATCH") list.[178] Plimus

---

[176] In Section 3.23 of the Merger Agreement.

[177] In Section 3.26(b) of the Merger Agreement.

[178] *Great Hill*, 2018 WL 6311829, at *30. The MATCH list serves as a system to alert processors to problematic merchants, and when processors terminate merchants, they often place them on the list. *Id*. at *8. When, in turn, processors add merchants, MasterCard recommends that the processor check the MATCH list; if the merchant appears on the MATCH list that is a red flag that the merchant may present a high risk. *Id*. Processors generally conduct more detailed review of a merchant as a result of finding it on the list, however, appearing on the MATCH list does not preclude a merchant from being added by a processor. *Id*.

34

entered into an agreement with a different payment processor, Merchant e-Solutions, and began processing transactions by November 13, 2011, but was terminated by Merchant e-Solutions on January 5, 2012.[179] Merchant e-Solutions similarly added Plimus to the MATCH list under the reason code "Violation of MasterCard Standards."[180]

Great Hill noted in an annual report for the year ending on December 31, 2011 that "Plimus was the only portfolio company to experience decline in valuation, as the company removed a number of high-risk clients from its payments platform, resulting in a negative short-term impact."[181] Great Hill wrote that Plimus had been terminated by PayPal and Merchant e-Solutions "related to MasterCard violations by certain Plimus clients" and that Plimus took "several corrective actions, including the immediate removal of a number of high-risk customers (which account for approximately 10% of volume)," which meant that Plimus fell short of its processing volume expectations.[182]

A business summary of Plimus's performance in the fourth quarter of 2011 noted several corrective actions in the wake of the processor terminations.[183] This included a January 2012 purge of approximately 500 vendors in "higher-risk

---

[179] *Id.* at *30.
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.*

merchant categories (auction/bid, forex software, media download, and virtual currency)"; Plimus also stopped accepting new merchants in these categories.[184] Great Hill also noted that Plimus changed its onboarding process, adding more review before new vendors could begin processing transactions.[185] Great Hill wrote: "the impact of these events and the decision to remove the higher-risk customers resulted in a decline in processing volume in December [2011] versus expectations, and we anticipate lower volumes into 2012."[186] Summarizing Plimus's business from the first quarter of 2012, Great Hill noted that Plimus's "key processing relationships appear to be stabilized."[187]

Tal was fired as CEO of Plimus in August 2012.[188] Great Hill invested $20 million in Plimus during 2012 and 2013 and Plimus received an additional $28 million of funding in 2014, of which $15 million came from outside investor Parthenon Capital Partners.[189] In 2014 Plimus largely abandoned the reseller model and instead began operating as a payment facilitator, a model processors and acquiring banks preferred because it mandated much greater transparency on the identity of Plimus's vendors.[190]

---

[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.* at *31.
[190] *Id.*

Great Hill has submitted that it has suffered damages as follows: $90,313,817 (the difference between the $115 million purchase price and the value of Plimus as of the Merger date, as Great Hill now calculates it) *plus* $31,500,000 (additional investments Great Hill made in Plimus after the Merger) *plus* $212,259 (from pre-closing fines).[191]   Thus, the Plaintiffs' total proffered damages are $122,026,076. The Plaintiffs derive their damages estimate from the Corrected Expert Report of Kevin F. Dages (the "Dages Report").[192]   The Plaintiffs engaged Dages to "review the record evidence and opine on the damages incurred by Great Hill as a result of the *alleged breaches* by Defendants and resulting diminution in the fair value of Great Hill's equity investment in Plimus."[193]   Dages identified the harm to the Plaintiffs as stemming from the loss of Plimus's key payment processors and the harm to Plimus's business and reputation from the pre-Merger violations of credit card association rules.[194]

### A. Difference in Merger Price vs. Estimated Value of Plimus

The bulk of the Dages Report focuses on calculating the "reduction in fair value of Plimus" attributable to the Defendants' actions—approximately $90 million

---

[191] Pls.' Opening Pre-Trial Br. on Damages, D.I. 650 ("Pls.' Opening Br."), at 36–37.

[192] JX 1132.

[193] *Id*. ¶ 6 (emphasis added).  As discussed below, the Dages Report was submitted into evidence at the liability phase of this action and was not updated subsequent to *Great Hill I*.

[194] *Id*. ¶ 7.

per the Dages Report. This represents the difference between the value of Plimus as represented ($115 million) and the value of Plimus that Great Hill actually purchased (calculated as $24,686,183).[195]

The Dages Report begins its estimate of Plimus's "fair value" by selecting a valuation metric. The Dages Report notes that "Great Hill justified the $115 million acquisition price to its Investment Committee based on multiples of 2011 actual Q2 run rate EBITDA and 2011 estimated Q4 and yearly EBITDA . . . ."[196] Dages also opines that the record suggests that there was "no significant new information regarding Plimus's prospects disclosed to Great Hill" between the development of Great Hill's projections and the close of the Merger.[197] Therefore, Dages deems it "appropriate" to estimate Great Hill's damages by referring to the "same methodology" that Great Hill used in determining the price Great Hill paid to acquire Plimus.[198] Dages ultimately uses the 2011 Q4 EBITDA multiple of 10.1x—the multiple upon which Dages states that Great Hill based its valuation.[199] Thus, Dages

---

[195] *Id.* ¶ 59.
[196] *Id.* ¶ 40. Dages notes that the estimates (of 2011 Q4 and yearly EBITDA) were based on Great Hill's "Base Case Projections," which reflected Great Hill's adjustments to Plimus's management projections; the Based Case Projections were adjusted "to be conservative and to reflect what [Great Hill] had learned during due diligence about vendor terminations (including those imposed by Plimus as well as through normal customer churn) and gains of new customer accounts . . . ." *Id.* ¶ 28.
[197] *Id.* ¶ 42.
[198] *Id.* ¶¶ 40, 42.
[199] *Id.* ¶¶ 41, 57.

valuation of Plimus of $24,686,183 is 10.1 times Dages's calculated 2011 Q4 EBITDA.

Dages begins his calculation of 2011 Q4 EBITDA with Plimus's *actual* 2011 Q4 EBITDA. This contrasts with Great Hill's *projected* 2011 Q4 EBITDA. Great Hill's projected 2011 Q4 EBITDA for Plimus was $11,413,400 and Plimus's actual 2011 Q4 EBITDA was $5,075,307.[200] $11,413,400 *times* 10.1 *equals* $115,000,000—the Merger price. $5,075,307 *times* 10.1 *equals* $51,260,596.[201] However, the delta between these numbers—$63,739,404— is not Dages's calculation of the difference between the fair value of Plimus and the Merger price.[202] Instead, Dages adjusts Plimus's actual Q4 2011 EBITDA to reflect what he views as the full extent of the harm.

Dages's adjustment to Plimus's actual Q4 2011 EBITDA represents the elimination of revenues from "transactions attributable to the lost volume due to Plimus's decision to terminate the relationship of customers with chargebacks in excess of levels allowed by the payment processors or other risk concerns."[203] The

---

[200] *Id*. at Ex. 4.
[201] *Id*.
[202] *Id*.
[203] *Id*. ¶ 43. Dages identifies these terminations as "Plimus terminations" in contrast to "customer terminations" which Dages defines as "terminations made at the option of the customer due to Plimus's loss of key payment processors." *Id*. Dages calculates "customer terminations" to include those customers who terminated their relationship with Plimus (rather than being terminated by Plimus) however, these vendors (added to the Plimus terminations resulting in an amount coined "Tranche 3" in the Dages Report) are not ultimately included in the damages calculation. *Id*. ¶ 59.

Plaintiffs explain that Dages made these adjustments to Plimus's actual Q4 2011 EBITDA because "the full effects of the fraud were not felt until 2012 and beyond . . . [t]hat is, the actual [Q4 2011] EBITDA results still included the benefit of profits from clients that were shortly were lost or terminated as the fallout from the fraud continued . . . ."[204]

Dages obtained monthly financial sales volume data from January 2010 through December 2012 from a database that collects data maintained in Plimus's "Huge Excel" files.[205] The "Huge Excels" are a series of Excel workbooks which were used at that time to compile merchant information as part of Plimus's business records.[206] The Plaintiffs also produced to Dages a "list of clients that ceased doing business with Plimus between the closing of the Merger and September 27, 2012" (the "Lost Client List").[207] Dages notes that the Lost Client List, on which he based the Dages Report, included, for those client accounts suspended by Plimus, "the date of suspension and the reason for suspension."[208]

---

[204] Pls.' Opening Br., at 34. The Plaintiffs also note that Plimus suffered decreased revenue from "clients that greatly reduced the amount of business they were sending Plimus." *Id*.

[205] JX 1132, ¶ 44.

[206] Trial Tr. 2679:4–2679:10 (LaPierre).

[207] JX 1132, ¶ 45. There are three versions of the Lost Client List in the record: JX 1110, JX 1128, and JX 2077. The Plaintiffs note that had the Dages Report been based on the Lost Client List presented at trial (JX 2077) the ultimate damages number increases approximately $1.6 million. Pls.' Opening Br., at 37 n.14. The Defendants objected to the Lost Client List (and "any purported expert opinions that rely on it") via a motion *in limine*. Defs.' Mot. *In Limine* to Exclude Pls.' So-Called "Lost Client List" and any Purported Expert Opinions that Rely on It, D.I. 518. Due to my findings below, I need not decide the motion.

[208] JX 1132, ¶ 45.

Dages identifies two "tranches" of customers based on the Lost Client List and removes those customers' corresponding revenue from actual Q4 2011 EBITDA. The first tranche ("Tranche One") is composed of 302 customers with a "Last Suspend Date" (meaning the last date the Lost Client List comments note a suspension) of January 12, 2012 and who all have the comment "SUSPEND: per Perach and Irit."[209] Dages surmises that these 302 customers are some of the approximately 500 customers terminated in the January 2012 purge.[210] Because Tranche One "may not reflect all customers terminated by pre-Merger Plimus management in January 2012, and does not reflect any customers terminated after early January 2012," Dages created a second tranche ("Tranche Two").[211] Tranche Two "adds to Tranche One the 1,557 remaining clients on the Lost Client List with a Last Suspend Date between the Merger close October 1, 2011 and June 30, 2012 (*i.e.* before Mr. Tal's firing in August 2012)."[212] Dages notes that Tranche Two is cumulative, in that it includes Tranche One.[213] In short, Dages backed out from Plimus's actual Q4 2011 EBITDA the corresponding revenue from *any* client who was terminated by Plimus between a few days after the close of the Merger and June

---

[209] *Id*. ¶ 46. Dages notes that Irit is Irit Itshayek and Perach Raccah "was Plimus's Chief Operating Officer" in 2011. *Id*.

[210] *Id*.

[211] *Id*.

[212] *Id*. I note as discussed above, the actual date of the Merger close was September 29, 2011.

[213] *Id*. Dages adjusted the Tranches in order to account for Plimus's normal churn of customers so that he only removed the revenue that exceeded Plimus's normal customer loss. *Id*. ¶¶ 48, 57.

30, 2012 (*i.e.* Tranche Two).[214] Dages states that adjusting actual 2011 Q4 EBITDA by backing out *only* these customers represents a "conservative estimate of the harm incurred by Great Hill."[215]

Dages adjusted the actual Q4 2011 EBITDA to account for the loss of revenue of vendors in Tranche Two,[216] and calculates the adjusted amount as $2,450,013.[217] This is a decrease from actual Q4 2011 EBITDA of $5,075,307.[218] Thus, in Dages's estimate, once accounting for all clients terminated by Plimus from October 1, 2011 through June 30, 2012, Plimus's 2011 Q4 EBITDA *would have been* $2,450,013.[219] Applying the 10.1x multiple, this results in a valuation of Plimus of $24,686,183.[220] The delta between $24,686,183 and $115,000,000 is $90,313,817. In Dages view, the difference between what Great Hill paid for Plimus and what Plimus was actually worth (based on Q4 2011 EBITDA) was $90,313,817.[221]

---

[214] In deriving EBITDA from revenue, Dages "assume[s] that the operating expenses that Plimus would have incurred upon removing the lost customers is equal to the actual operating expenses incurred" because "the record evidence indicates that Plimus's operating expenses were relatively fixed in the short-term (and Plimus did not benefit from reduced operating expenses as revenue declined in 2012)." *Id*. ¶ 49. I note that customers who were added after Q4 2011 are not backed out because there is no corresponding revenue in Q4 2011.

[215] *Id*. ¶ 57.

[216] As noted, Tranche Two is cumulative of Tranche One and Tranche Two.

[217] JX 1132, Ex. 4.

[218] *Id*. The adjustments drop the corresponding total volume from $246,559,738 to $199,348,943. *Id*.

[219] *Id*.

[220] *Id*.

[221] *Id*. Dages performs several sensitivity analyses and confirms that they result in damages within the range of his primary damages analysis (which employs only multiples (based on Q4 and full year 2011 EBITDA) and Tranches). *Id*. ¶ 57.

*B. Additional Investments and Fines*

Dages notes that "in order to fund operations and rebuild the customer base to recover from the 2012 customer terminations," Great Hill invested $31.5 million in additional equity between September 2012 and December 2014.[222] Dages states that "to the extent that the Court determines that some or all of these investment amounts should be considered to be damages, they are incremental" to the approximately $90.3 million described above.[223] Finally, Dages notes $612,258.74 in undisclosed pre-closing fines—the Dages Report was submitted before *Great Hill I*, and the Plaintiffs have submitted only $212,259 in pre-closing fines at this damages phase, consistent with the limited liability findings in that decision.[224]

## III. ANALYSIS

Great Hill seeks monetary damages. Resulting damages are an element of the tort and contract claims,[225] and Great Hill must prove its damages by a preponderance of the evidence.[226] Below I discuss damages for the fraud and indemnification liability identified in *Great Hill I*.

---

[222] *Id.* ¶ 58.

[223] *Id.*

[224] *Id.*; Pls.' Opening Br., at 37, 50.

[225] *See York Lingings v. Roach*, 1999 WL 608850, at *3 (Del. Ch. July 28, 1999) (listing damages as an element of fraud); *see also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (noting "resultant damage to the plaintiff" as an element of breach of contract).

[226] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

As the analysis above makes clear, Dages' damage analysis, on which Great Hill relies, made the assumption that Great Hill would prevail on its extensive allegations of misrepresentation and fraud. As a weary perusal of the background section of this Memorandum Opinion should also demonstrate, the bulk of those wide-ranging allegation were unproved and cannot support damages. The Plaintiffs, however, were content, to rely on the factual evidence at trial together with the Dages Report and testimony to demonstrate damages.[227] It falls to me, therefore, to determine what portion of the damages alleged are reasonably demonstrated to have

---

[227] At the post-trial damages Oral Argument the following exchange occurred with Tal's counsel: "The Court: Before you begin, let me ask you what your understanding was -- and maybe mine was wrong -- but I had thought we were going to have additional evidentiary presentations after the trial on damages that would focus damages on the results of the post-trial opinion. Obviously, the parties agreed to a briefing schedule, and I assume everyone is content with the record as it is. But was that -- was your understanding that we were -- that the record was and is limited to what was presented at trial? Mr. Coran: Yes, Your Honor." Post-Trial Damages Oral Argument, D.I. 677, at 53:12–53:22. Plaintiffs' counsel later remarked: "I think, starting first with Your Honor's question about additional evidence, I think the plaintiffs didn't think additional evidence was necessary, precisely because the Court found there was fraud regarding PayPal. There certainly was a variety or -- I shouldn't even say that. There were several fraud claims presented at trial, but they all built to the PayPal fraud. The PayPal fraud was always the main issue. It's also where we tracked the damages from. And when that was the fraud that was found, we thought we could move forward on that basis. If Your Honor thinks that more specific evidence or additional evidence would be helpful in quantifying that, plaintiffs are certainly willing to do that. But it was precisely because the fraud that was found here that we thought we could move forward with the expert report that we had. And I think on – there's a number of reasons on that. Your Honor's opinion in the liability opinion found, quote, 'the possibility of losing a second major processor in a matter of [a] few months to be material to a prospective buyer.' Right. 'Furthermore, unlike with Paymentech, Plimus was not ambivalent to the PayPal relationship, and the loss of PayPal would mean a major disruption to Plimus's business. And Tal knew that the grounds raised by PayPal - excessive chargebacks - were an ongoing problem for Plimus.' So, again, that's sort of where we focus our damages analysis on, and that's why we proceeded on this basis." *Id*. at 103:1–104:8. At the end of the post-trial damages Oral Argument, I noted: "I appreciate the offer from Mr. Burns to supplement the record if I feel I need to, but I think there's been an election here from both sides to rely on the record developed at trial. I'm going to do that going forward." *Id*. at 114:20–114:24.

44

occurred as a result of the actions for which the Defendants are liable, based on this record.

*A. Great Hill is Only Entitled to Damages Resulting from PayPal's Termination Threats and the PayPal and Paymentech Fines*

As recounted in detail above, Tal was found liable for fraud in *Great Hill I* for the non-disclosure of the PayPal termination threats and the GoClickCash fine. The Indemnification Defendants were found to have indemnification obligations for the breach of the representation on compliance with card system rules in connection with the GoClickCash fine, the other PayPal fines, and the Paymentech fines; the Indemnification Defendants were also found to have indemnification obligations for the breach of the representation on relationships with suppliers in connection with the PayPal termination threats. Significant overlap exists between the tortious and extra-contractual conduct, falling into two buckets: PayPal termination threats and fines. I discuss each in turn.

1. Fines

a. PayPal Excessive Chargeback Fines for July and August 2011

The Indemnification Defendants were found to have indemnification obligations for breaches of Section 3.23 of the Merger Agreement in connection with

45

PayPal's fines for excessive chargebacks in July and August of 2011.[228] All of the Indemnification Defendants have conceded damages of $12,255.74 for these two fines.[229] The Plaintiffs have not disputed the amount of such fines.[230] Consequently, I find that the damages resulting from the fines assessed by PayPal for excessive chargebacks in July and August of 2011 are $12,255.74 to be paid from the escrow funds.

### b. PayPal Fine for GoClickCash

The Indemnification Defendants were likewise found to have indemnification obligations for a breach of Section 3.23 of the Merger Agreement in connection with PayPal's $200,000 fine related to GoClickCash.[231] Tal was found liable for fraud for the non-disclosure of the same $200,000 fine.[232] Tal concedes $200,000 in fraud damages for the GoClickCash fine.[233]

---

[228] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *47 (Del. Ch. Dec. 3, 2018).

[229] Def. Hagai Tal's Answering Br. on Damages, D.I. 653 ("Tal's Answ. Br."), at 53; Defs. Tomer Herzog and Daniel Kleinberg's Answering Br. on Damages, D.I. 652 ("Founders' Answ. Br."), at 5; Answering Damages Br. of the Charity Defs., the SIG Entity Defs., and Irit Segal Itshayek, D.I. 654 ("Charity Defs., SIG Entity Defs., and Itshayek's Answ. Br."), at 9–10.

[230] Pls.' Reply Br. on Damages, D.I. 622 ("Pls.' Reply Br."), at 48 n.33. I note that the Plaintiffs allege $212,259 in pre-closing fine damages, which is a $3.26 difference from the sum of the $12,255.74 in chargeback fines conceded by the Indemnification Defendants and the $200,000 GoClickCash fine—I consider the $3.26 difference immaterial and award the amount conceded by the Indemnification Defendants because it is not disputed by the Plaintiffs.

[231] *Great Hill*, 2018 WL 6311829, at *47.

[232] *Id*. at *43–45.

[233] Tal's Answ. Br., at 53.

The other Indemnification Defendants do not dispute the amount of the fine. They point out, however, that their obligations for payment are subject to a $500,000 deductible amount under the Merger Agreement. Whether liability exceeds the deductible will turn, in part, on indemnification obligations for the Plaintiffs' attorney fees,[234] an issue that I will address in a subsequent order (for reasons addressed *infra*). Therefore, I reserve decision, and will not address the deductible further in this Memorandum Opinion.

### c. Paymentech Fines

*Great Hill I* also identified a breach of Section 3.23 of the Merger Agreement in connection with the non-disclosure of violations in connection with Paymentech, which the Indemnification Defendants are required to indemnify.[235] However, I

---

[234] Section 10.03(a) of the Merger Agreement provides, in pertinent part: "(i) the Effective Time Holders will not have any obligation under Section 10.02(a)(i) (other than with respect to the Fully Indemnified Representations), unless and until the aggregate amount of all Losses for which the Effective Time Holders are obligated thereunder exceeds $500,000 (the "Deductible"), and then only for the amount of such Losses in excess of the Deductible, subject to the other terms of this Article 10 . . . ." JX 796, at 71. Section 10.02(a)(i) of the Merger Agreement concerns "Losses . . . as a result of, in connection with or relating to . . . any breach by the Company of any representation or warranty of the Company set forth herein, in any Disclosure Schedule or in the company Closing Certificate." JX 796, at 69. "Losses" is defined as "any actual loss, liability, damage, obligation, cost, deficiency, Tax, penalty, fine or expense, where or not arising out of third party claims (including interest, penalties, reasonable legal fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing) . . . ." JX 796, at 69. All parties concede that the July and August 2011 chargeback fines are not subject to the deductible because they fall under Section 10.02(a)(iii). *See* Tal's Answ. Br., at 53; Founders' Answ. Br., at 5; Charity Defs., SIG Entity Defs., and Itshayek's Answ. Br., at 9–10; Pls.' Reply Br., at 48 n.33. Section 10.02(a)(iii) of the Merger Agreement covers "fines, penalties, or similar assessments imposed against the Company or any of its Subsidiaries for violating applicable credit card association policies, procedures, guidelines or rules with respect to excessive chargebacks or similar recurring payments . . . ." JX 796, at 69.

[235] *Great Hill*, 2018 WL 6311829, at *47.

47

noted in *Great Hill I* that any fines related to the Paymentech violations were paid before closing and the Paymentech relationship ended before the bidding process was even complete, and remarked that "the Plaintiffs, will, perhaps, have difficulty showing any damages with respect to the Paymentech violations."[236] The Plaintiffs have given me no reason to deviate from this preconception; they have offered no damages tied to the non-disclosure of the pre-closing Paymentech fines—the Plaintiffs ask for damages for "pre-closing fines" in an amount equal to the PayPal July and August 2011 chargeback fines and the GoClickCash fine.[237] Therefore, the Plaintiffs are awarded no damages in connection with the non-disclosure of the Paymentech fines.

### d. Summary of Fine Liability

In summary, the Indemnification Defendants must pay damages of $12,255.74 for the July and August 2011 chargeback fines from PayPal. Tal must pay $200,000 in fraud damages for the PayPal GoClickCash fine. No damages are awarded in connection with the Paymentech fines. I reserve decision on whether the Indemnification Defendants may avoid indemnification for the $200,000 GoClickCash fine under the deductible provision in the Merger Agreement.

---

[236] *Id.*

[237] Pls.' Opening Br., at 37; *see* note 230, *supra*.

## 2. Non-Disclosure of PayPal's Termination Threats

Other than fine-related damages, the *only* remaining damages to be considered are those in connection with the failure to disclose PayPal's termination threats. The liability for this non-disclosure stems from fraud—in the case of Tal—and indemnification for breach of contract[238]—in the case of the Indemnification Defendants. While the source of liability is different—tort vs. contract—the damages to the Plaintiffs arising from the liability are identical. Therefore, I consider together the conduct underlying the breach of contract and fraud connected to the non-disclosure of PayPal's termination threats.

The germane question is as follows: what harm did Great Hill suffer as a consequence of not being told of PayPal's threats to terminate its relationship with Plimus, in light of PayPal's actual termination, immediately post-Merger? Contract law conceives of damages based on "the reasonable expectations of the parties *ex ante*."[239] Expectation damages are "measured by the amount of money that would put [Great Hill] in the same position as if [Plimus] had performed the contract" and "require[s] the [Indemnification Defendants] to compensate [Great Hill] for [Great Hill's] reasonable expectation of the value of the breached contact, and, hence what

---

[238] Specifically Section 3.26(b) of the Merger Agreement; I found that this Section was breached because PayPal had communicated an "intent" to terminate its relationship. *Great Hill*, 2018 WL 6311829, at *47.

[239] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015) (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

[Great Hill] lost."[240]    As for fraud, "[t]he recipient of a fraudulent misrepresentation[241] is entitled to recover as damages . . . the pecuniary loss to him of which the misrepresentation is a legal cause . . . ."[242]  Both contract and tort law thus conceive of damages as the pecuniary consequences of the breach or tort.  This requires an identification of the conduct for which a defendant is liable and an isolation of the harm occurring therefrom.  Here, I must separate the non-disclosure of PayPal's termination threats—and the harm occurring therefrom—from all other fraud and breach allegations.  Only then can I turn to the quantum of damages.  Those damages, in turn, must represent the difference between what the Plaintiffs expected—Plimus with PayPal as a processor—and what they got—Plimus *sans* PayPal.

*Great Hill I* spoke to the consequences of the non-disclosure of PayPal's termination threats in the context of the materiality of Tal's fraud: "the possibility of losing a second major processor in a matter of few months [was] material to a prospective buyer . . . and the loss of PayPal would mean a major disruption to Plimus's business."[243]  The repercussions were stark: the loss of the ability to use

---

[240] *Id*. (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

[241] The fraudulent misrepresentation here is the representation that "no suppliers had threatened termination even though PayPal had made several such threats throughout August and September 2011." *Great Hill*, 2018 WL 6311829, at *47.

[242] Restatement (Second) of Torts § 549 (1977).  "Delaware courts have cited the Restatement (Second) of Torts [§] 549 . . . with approval." *Envo, Inc. v. Walters*, 2009 WL 5173807, at *7 n.37 (Del. Ch. Dec. 30, 2009), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013).

[243] *Great Hill*, 2018 WL 6311829, at *44.

PayPal as a payment processor. The loss of the PayPal relationship had consequences; I found that "[t]he loss of PayPal as a processor and the temporary loss of PayPal [W]allet as a payment method affected Plimus's ability to do business" and "hurt Plimus's reputation."[244]

While this finding of fraud is significant, I also found against the Plaintiffs on the bulk of their fraud claims. Among other fraud claims, I found *no liability* for fraud allegations concerning Plimus's risk monitoring system, Plimus's history of violations, and Plimus's vendor quality.[245] Supporting this conclusion were findings that Great Hill was aware: (1) that Plimus did not have proactive risk monitoring,[246] (2) that Plimus had an "extensive history with chargebacks,"[247] (3) that "Plimus's onboarding process allowed vendors—including illegitimate vendors—to potentially transact business through Plimus for months before discovery,"[248] and (4) "of Plimus's business model, including the quality[249] of vendors."[250] These were facts known to Great Hill, and presumably factored into the price it chose to pay for Plimus. This means that Great Hill is *not* entitled to damages because Plimus (1) did not have proactive risk monitoring, or (2) had a history of chargebacks, or (3)

---

[244] *Id*. at *30.
[245] *Id*. at *36–40.
[246] *Id*. at *38.
[247] *Id*. at *40.
[248] *Id*. at *41.
[249] Or lack thereof.
[250] *Great Hill*, 2018 WL 6311829, at *41.

51

had illegitimate vendors on its system.[251] In other words, even though PayPal may have terminated the relationship because of certain characteristics of Plimus's business—including a high level of chargebacks and illegitimate vendors—Great Hill is not entitled to receive damages for the consequences of these traits of Plimus's business—other than those proximately caused by the PayPal termination itself—because I found no liability for the allegations in connection with them.[252]

The implications of the above are that Great Hill is only entitled to damages consequent to the loss of the PayPal relationship which meant the inability to use PayPal's services, and the resulting reputational damage. The underlying reasons as to why PayPal may have terminated the relationship—which could include chargebacks, lack of risk monitoring, and illegitimate vendors—are not a proper basis for assessing damages generally for those conditions which, again, were known to Great Hill at the time of the Merger. The Plaintiffs sought liability for claims connected with these characteristics of Plimus's business, and lost. They do not get a second bite at the damages apple; recovering damages, for instance, for the consequences of Plimus's abundancy of illegitimate vendors, by squeezing that

---

[251] This list is illustrative, not comprehensive.

[252] *See Hajoca Corp. v. Sec. Tr. Co.*, 25 A.2d 378, 381 (Del. Super. 1942) ("The law does not hold one liable for all injuries that follow a breach of contract, but only for such injuries as are the direct, natural and proximate result of the breach."); *see also Cont'l Illinois Nat. Bank & Tr. Co. of Chicago v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987) (dismissing a fraud claim under Chancery Court Rule 9(b) where "the complaint [was] barren of particularized allegations as to how the alleged fraud proximately caused [the plaintiff] to suffer damages.").

allegation under the rubric of PayPal's termination. Therefore, other than fine-related damages, the Plaintiffs are entitled only to damages resulting proximately from the loss of PayPal as a payment processing service.[253] I now proceed to quantifying these damages.

### B. The Plaintiffs' Damages Calculation for the Non-Disclosure of the PayPal Termination Threats is Speculative

The burden is on Great Hill to demonstrate damages, which is an element of both breach of contract and fraud cases of action. Great Hill must prove the fact of damages in connection with PayPal's termination threats "with a reasonable degree of certainty"[254] but the "quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage."[255] "Delaware does not require certainty in the award of damages where a wrong has been proven and injury established . . . [and] [r]esponsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.'"[256] In accordance with public policy, Delaware courts place the burden of uncertainty where it belongs; so long as a plaintiff provides a

---

[253] This includes the services provided by PayPal Wallet.

[254] *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016) (quoting *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004)).

[255] *Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. July 10, 2003).

[256] *Medicalgorithmics*, 2016 WL 4401038, at *26 (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010)). In the context of contractual damages, our Supreme Court has stated: "when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty. The amount of damages can be an estimate." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged.[257] "Nevertheless, when acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove damages."[258] With these general principles in mind, I turn to the record here.

The Plaintiffs' have presented the Dages Report as a basis to award contractual and fraud damages for the misrepresentations and omissions in connection with PayPal's termination threats. The Plaintiffs' damages expert, Kevin F. Dages, calculated the difference between the Merger price and the "fair value" of Plimus as the 10.1 EBITDA multiple times the sum of (1) the difference between Plimus's actual Q4 2011 EBITDA and Plimus's expected Q4 2011 EBITDA[259] and (2) the portion of Plimus's actual Q4 2011 EBITDA that is attributable to customers on the "Lost Client List" that Plimus terminated between October 1, 2011 and June 30, 2012 (after accounting for expected churn).[260] Along with this amount, the Plaintiffs contend that their damages from the loss of the PayPal relationship also includes the $31.5 million they invested in Plimus after the Merger.[261] Plaintiffs thus throw everything in the hopper: *all* amounts by which Plimus missed Great Hill's

---

[257] *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013).
[258] *Id*. (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)).
[259] As projected by Great Hill.
[260] JX 1132, ¶ 59.
[261] *Id*.

54

projections for Q4 2011 EBITDA, *all* revenue and volume from vendors terminated in the 9 month period after the Merger, and *all* amounts Great Hill invested in Plimus in the years after the Merger.

Due to Tal's fraud, Great Hill reasonably expected it was buying Plimus with PayPal as one of its processors, it received Plimus *without* a PayPal relationship. The fundamental problem with the Plaintiffs' damages estimate is that it offers the entirety (and more) of the deviation from Great Hill's EBITDA estimate as damages, but fails to link the harm from the non-disclosure of PayPal's termination threats to the damages calculation, "mak[ing] it impossible to determine what amount of damages, if any, was caused by that wrong."[262]

Importantly, the Dages Report was completed before the trial and before I issued *Great Hill I*, when Plaintiffs' allegations of fraud were so wide-ranging, the Plaintiffs themselves stated that they were too extensive to recount in full in their briefing.[263] The fraud finding in *Great Hill I*, in contrast, was quite cabined; two allegations (one for a relatively minor sum certain) against one Defendant. Dages himself admitted that his "assignment was to calculate a damage number, and [he]

---

[262] *OptimisCorp v. Waite*, 2015 WL 5147038, at *81 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

[263] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *31 (Del. Ch. Dec. 3, 2018) ("While the Plaintiffs, unhelpfully, argue in briefing that the 'fraud in this action was extensive, and cannot be recounted in full here,' they 'highlight [ ] four major interrelated components' of the fraud.").

did not attempt to parse that damage number across all the different overlapping components of the fraud."[264]  Further questioning of Dages is insightful:

> Q.     You do not identify the amount of damages attributable to the loss of Paymentech; right?
>
> A.     I do not parse the aggregate damages among all the multiple components of the fraud, that's correct.
>
> Q.     Okay.  You do not opine on what portion of your damages figures were caused by the loss of the PayPal Pro account.  Right?
>
> A.     Same answer.
>
> Q.     You don't do that; right?
>
> A.     Sorry?
>
> Q.     You do not do that; correct?
>
> A.     Correct.  I was just trying to save the court reporter.  Same answer, yes.[265]

Thus, Dages himself testified that his calculations fail to break out damages from the wrongs Great Hill was able to establish at trial, which are a rather small subset of its allegations.  Yet, even after I issued *Great Hill I*, the Plaintiffs have elected to stand on the Dages Report as their damages estimate of the Defendants' liability.

The deficiencies of the Plaintiffs' damages estimate are not limited to those represented by the forgoing flaw.  Neither component that Dages deducts from the

---

[264] Trial Tr. 2779:10–2779:13 (Dages).
[265] *Id*. at 2780:11–2780:24 (Dages).

Merger price to arrive at "fair value" has any mechanism for segregating out the decrease in Q4 2011 EBITDA attributable to the loss of PayPal.[266] Thus, the Plaintiffs ask me to hold that *all* actual decrease in Q4 2011 EBITDA and *all* customer terminations from October 2011–June 2012 are tied to the loss of PayPal's payment processing services. Plaintiffs make these assertions notwithstanding the fact that the "Lost Client List" does not even identify *which Plimus clients used PayPal,* even though it appears that the Plaintiffs had access to this information.[267] What difference this may make is untold—by my count, of the 3,415 "Merchant IDs" on the Lost Client List, only seven have the word "PayPal" in their comments.[268] Furthermore, 455 merchants who joined Plimus's platform post-closing, and thereafter were terminated, are included in Tranche Two of the Dages Report, for which the Plaintiffs seek damages here.[269] When asked about the inclusion of these terminated merchants in the damages calculation, Dages replied:

> I think merchants that are joining post close that get terminated by the time the management team leaves or terminated in January are more evidence of the *lack of controls and not sustainable customers that ought to have been in [the damages figure].* And had all this information be revealed to the buyers, and for some reason they had a gun to their head to still go to the table, they clearly would have peeled these out of any valuation piece.[270]

---

[266] This assumes that it is non-speculative to base the damages for the loss of the PayPal relationship on a multiple of Q4 2011 EBITDA. I do not reach the question of whether such a snapshot approach to damages is reliable here.

[267] JX 2077; Trial Tr. 2698:10–2699:12 (LaPierre).

[268] JX 2077.

[269] Trial Tr. 2769:16–2772:2 (Dages).

[270] *Id*. at 2771:16–2772:2 (Dages) (emphasis added).

Thus, Dages bases the inclusion of these 455 merchants in the damages calculation to "lack of controls" and "not sustainable customers" that Great Hill "would have peeled . . . out of any valuation piece" "had all this information be[en] revealed to [Great Hill]."[271] Yet, the Plaintiffs are *not* entitled to damages for customers who were terminated from Plimus solely due to lack of controls or unsustainability—a state of affairs of which, I found, the Plaintiffs were aware upon entering the Merger—only for damages for the loss of PayPal.[272]

The Plaintiffs' request for damages totaling the full amount of their investment in Plimus post-Merger suffers from the same deficiencies—nowhere do the Plaintiffs segregate what portion of this post-Merger investment—if any—was required because of the loss of PayPal.[273] Furthermore, the Plaintiffs have not shown how the damages they request for reimbursement are not already encompassed in their "fair value" estimate. In other words, the Plaintiffs ask for damages that would compensate them for the difference between the Merger price and Plimus's value, then *also* ask for $31.5 million in additional damages.

---

[271] *Id*. at 2771:19–2771:24 (Dages).
[272] *See* Section III.A.2. *supra*.
[273] Compared to the portion, if any, of the post-Merger investment that would have been made regardless of whether PayPal terminated the relationship.

58

Plaintiffs' rely on *Cobalt Operating, LLC v. James Crystal Enterprises, LLC*[274] in support of the proposition that I may award damages in addition to the difference in value between what was paid for Plimus and Plimus's actual value. In that case, this Court found that the defendant had falsely inflated a radio station's EBITDA by billing clients for ads that did not run and the buyer had purchased the station based on its projected EBITDA.[275] When the buyer discovered the fraud had occurred, it decided to grant free airtime credits to advertisers that were affected during the three month period after the sale while the fraud was still ongoing.[276] In addition to damages linked to the sale price, the buyer sought reimbursement for the costs of the free airtime, which this Court granted, reasoning that the free airtime given out "used up commercial time that could have been used for a full-price commercial" and thus it "had a direct impact on [the buyer's] bottom line."[277] In *Cobalt*, an identifiable difference existed between the value of the company and the merger price on one hand, and the additional damages incurred to compensate third parties on the other. For both, the fraud was the proximate cause. Here, in contrast, there is no specific identifiable harm existing outside the Merger that would not be compensated by awarding the Plaintiffs damages based on the "fair value" of

---

[274] 2007 WL 2142926 (Del. Ch. July 20, 2007) *aff'd*, 945 A.2d 594 (Del. 2008).
[275] *Id*. at *25, *27.
[276] *Id*. at *30.
[277] *Id*. at *31.

Plimus.[278]  The nexus between the tort and the other damages sought, evident in

*Cobalt*, is lacking here.

In *Siga Technologies, Inc. v. PharmAthene, Inc.*, our Supreme Court held that

a "breaching party cannot avoid responsibility for making the other party whole

simply by arguing that expectation damages . . . are speculative because they come

from an uncertain world created by the wrongdoer."[279]  This rationale applies equally

to torts, and the United States Supreme Court has stated that "[w]here the tort itself

is of such a nature as to preclude the ascertainment of the amount of damages with

certainty, it would be a perversion of fundamental principles of justice to deny all

relief to the injured person, and thereby relieve the wrongdoer from making any

amend for his acts."[280]  In this vein, where the uncertainty of the amount of damages

is not the fault of the plaintiff and is the fault of the defendant, "to the extent the

court has to resolve uncertainties, those uncertainties will be resolved in the

plaintiffs' favor."[281]  This makes sense as a matter of policy—a wrongdoer should

---

[278] Additionally, there was no substantial ongoing fraud post-Merger here as there was in *Cobalt* because Tal informed Great Hill of the PayPal termination within days after the termination occurred (which was about two weeks after the Merger closed).  *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *29 (Del. Ch. Dec. 3, 2018).

[279] 132 A.3d 1108, 1111 (Del. 2015).

[280] *Vianix Delaware LLC v. Nuance Commc'ns, Inc.*, 2010 WL 3221898, at *7 (Del. Ch. Aug. 13, 2010) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

[281] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 19 (Del. Ch. 2003) (citing *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1023 (Del. 2001)).

not be permitted to use a prohibition against award of uncertain damages as a shield, where that uncertainty is attributable to the wrongdoer himself.

Here, in contrast, it is the Plaintiffs who, having presented a substantial number of fraud claims and succeeded on a fraction of the total, have presented a damages analysis that, in the words of the Plaintiffs' damages expert, "do[es] not allocate the damages total among all the various components and contributing factors of the fraud . . . ."[282] Furthermore, the Lost Client List, created by the Plaintiffs and relied upon by Dages for his analysis, does not include any information demonstrating the relationship of particular lost clients to the use of PayPal, even though the database from which it was drawn—which is controlled by the Plaintiffs—contains data showing what payment processor was used for any particular transaction.[283] The uncertainty of damages here, if attributable to any party, is attributable to the Plaintiffs. They could have, but did not, provide a non-speculative way to quantify damages from the loss of PayPal.[284]

I reiterate that "when acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove

---

[282] Trial Tr. 2781:4–2781:6 (Dages).

[283] *Id*. at 2698:4–2699:12 (LaPierre); JX 2077.

[284] Because I find that the Plaintiffs have failed to meet their burden with regard to the damages methodology, I do not reach the Defendants' contentions that Plimus's downturn was not as severe as suggested by Great Hill and that explanations exist for any downturn other than the allegations lodged by Great Hill. Indeed, Great Hill's own annual report for 2011 noted that Plimus's Q4 2011 EBITDA "declined primarily due to 25 incremental hires necessary to support *Plimus'[s]* anticipated growth." JX 922, at 3.

damages."[285]  Any attempt I could make to assign damages caused by Plimus's loss

of PayPal as a payment processor would be mere speculation or conjecture because

the Plaintiffs failed to tie *any* portion of their damages estimate to the loss of PayPal

as a processing service provider.  While I have found that the Plaintiffs suffered

harm from the non-disclosure of PayPal's termination threats,[286] harm is in itself

insufficient for a damages award if I have no basis to make a "responsible estimate"

of damages.[287]  It would be, in my view, irresponsible to assign damages to the

Plaintiffs for the tortious and extra-contractual non-disclosure of PayPal's

termination threats on the record before me.  While I assume that the Plaintiffs

suffered some pecuniary damage from Tal's behavior, were I to assign an amount to

that damage I would be only marginally more confident than if I randomly picked a

number between $0 and $121,813,817.  To grant damages on that dubious

foundation would run afoul of Delaware law.  The Plaintiffs were "allowed to make

[the] strategic choice to present one unified remedy theory.  This choice, however,

now prevents me from awarding damages for the parts of its case that it was able to

prove as it has given me no way to separate the actual harm to [the Plaintiffs] from

---

[285] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013) (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)).

[286] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *30, *44 (Del. Ch. Dec. 3, 2018).

[287] *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016) (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010)).

the consequences of allowed behavior by the [Defendants]."[288] I consequently award no fraud or contract damages to the Plaintiffs in connection with the misrepresentations regarding PayPal's termination threats.

### C. Unjust Enrichment

The Plaintiffs allege unjust enrichment against SIG Fund, Tal, Herzog, Kleinberg, Itshayek, and the Charity Defendants. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[289] The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[290]

I need only address the last element, which is manifestly not met. Sufficient funds are in escrow to make the Plaintiffs whole for the loss they have demonstrated, and there is no need for equity to act.[291] I make no determination whether, if such were not the case here, unjust enrichment would apply.

---

[288] *CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *29 (Del. Ch. July 31, 2018), *rev'd on other grounds sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019).

[289] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[290] *Id.*

[291] Tal has conceded that "any damages award against Tal must first be offset" by $478,508 and $678,605 of Merger proceeds placed in escrow and evidenced by promissory notes. Tal's Answ. Br., at 53. Additionally, the Escrow Amount of $9.2 million is significantly more than the

Because the Plaintiffs have failed to show an inadequate remedy at law, I deny their unjust enrichment claim.

*D. Fees and Costs*

Finally, the Plaintiffs have sought indemnification, under the Merger Agreement, for fees and costs incurred in investigating Defendants' fraud and contract breaches. The Founders have submitted that after I render this decision they will move for an award of their own attorneys' fees and costs, also under the Merger Agreement.[292] For efficiency's sake, I hold the Plaintiffs' claims for fees and costs in abeyance, and will consider them concurrently with any applications for fees and costs of any Defendants.[293]

## IV. CONCLUSION

Tal is liable for $200,000 in fraud damages. The Indemnifications Defendants are liable for $12,255.47 in indemnification obligations payable from the escrow funds and split *pro rata* in accordance with the Merger Agreement, as well as for the $200,000 GoClickCash fine to the extent not barred by the deducible provision of the Merger Agreement. The Plaintiffs are entitled to prejudgment interest on these

---

$212,255.47 of damages owed by the Indemnification Defendants (without consideration of amounts that may be excluded under the deductible).

[292] Founders' Answ. Br, at 15.

[293] If any Defendant wishes to move for fees and/or costs under the Merger Agreement, they should do so within ten (10) business days from the issuance of this Memorandum Opinion.

sums.  The parties should submit a form of order consistent with this Memorandum

Opinion.